# Richmond

J. Pemberton Penn, Jr., Executor v. Pemberton & Penn, Inc., and Others.

June 20, 1949.

Record No. 3480.

Present, All the Justices.

The opinion states the case.

*Meade & Talbott* and *Grasty Crews*, for the appellant.

*Aiken & Carter*, for the appellees.

HUDGINS, C. J., delivered the opinion of the court.

This is a controversy between the minority and the majority shareholders of Pemberton & Penn, Inc., a solvent corporation. J. Pemberton Penn, at the time of his death in 1947, was a director, president, and owner of 1,500 shares, or one-third of the outstanding stock of the corporation. The other 3,000 shares were owned by George R. Penn, Richard T. Penn, Elizabeth Penn Carter, and Everett E. Carter, who were, and are, officers and directors. J. Pemberton Penn, Jr., and American National Bank & Trust Company qualified as personal representatives of J. Pemberton Penn, and instituted this suit alleging that the purpose for which the corporation was formed had failed, praying that the corporation be dissolved, and that its assets be distributed under the supervision of the court. A decree was entered denying the prayer, and dismissing the bill. Complainants obtained this appeal.

Pemberton & Penn is, and has been, a close corporation since 1917, when James G. Penn, Rucker Penn, Ben R. Penn, George R. Penn, and J. Pemberton Penn acquired all of its outstanding stock.

The primary purpose for which the corporation was formed was to conduct a leaf tobacco business, with its principal office in Danville, Virginia. From 1918 to 1939, it was active and successful in the conduct of this business.

The total sum the five Penns invested in the corporation was $190,000. During the period stated it paid each of them a substantial salary annually, declared cash and stock dividends from time to time, and increased its net worth to more than $1,000,000.

The corporation bought green tobacco on auction warehouse floors in the flue-cured area (Georgia, South Carolina, North Carolina and Virginia) by its own employees, or on orders given to other buyers who were paid on a commission basis. It bought tobacco "on order" for the Japanese Government for which it was the sole agent. This tobacco was redried in its redrying plant in Danville and shipped to Japan. The great bulk of tobacco was bought by the corporation for its own account, processed or redried by others near the place where bought, and then stored on the Atlantic seaboard either in Newport News or Norfolk. The tobacco was then offered for sale by sample and most of it bought by European customers.

In 1939, Ben R. Penn died and his 1,500 shares of stock were inherited by his daughter, Elizabeth Penn Carter. She transferred 50 shares of this stock to her husband, Everett E. Carter, both of whom were later elected directors and officers of the corporation. In 1942 James G. Penn and Rucker Penn died. The 3,000 shares owned by them were purchased by the corporation for $110.00 per share, and the stock cancelled. In October, 1947, J. Pemberton Penn died, and his 1,500 shares passed to his personal representatives in their fiduciary capacity. The offer of the corporation to purchase this stock at $147.00 per share was declined by appellants who thereafter demanded a dissolution of the corporation and a distribution of its assets. This demand was refused and this suit instituted.

The pertinent provisions of Code, section 3810b, authorize a court of equity "to wind up" and dissolve a corporation, though solvent, whenever the principal purpose for which it was formed has failed, or when the management of the corporation has been abandoned by its officers and directors.

This statute, in part, is declaratory of the general rule that a court of equity has inherent power, on the request of minority stockholders, to dissolve a solvent corporation when it appears that the directors or a majority of the stockholders have been guilty of fraud or gross mismanagement, or where the principal purpose for which the corporation was formed has become impossible of attainment. *Bowen* v. *Bowen-Romer Flour Mills Corp.*, 114 Kan. 95, 217 P. 301, 43 A. L. R. 238; Annotations 242, 318; Annotations 61 A. L. R. 1212, 91 A. L. R. 665; see article entitled *"Judicial Power to Wind up a Corporation at the Suit of a Minority Stockholder,"* Columbia Law Review, Vol. XL, 220.

In accord with this general rule, we held in *Brennan* v. *Rollman*, 151 Va. 715, 145 S. E. 260, that equity had power to take possession of and liquidate a solvent corporation at the instance of minority stockholders only in the event that it clearly appeared that the purposes for which the corporation was formed had become impossible of attainment, and to permit the business to continue would be manifestly ruinous to its stockholders.

Since the finding of the trial court was based on evidence taken *ore tenus*, all conflicts have been decided against appellants, and we must consider the evidence in the light most favorable to appellees, the successful litigants in the lower court. So considering the evidence the record presents the following facts:

There are two methods of conducting a leaf tobacco business, the principal purpose for which the corporation was created. One is to buy "on order." This means that the buyer on the warehouse floor is acting as agent for another and using such other's money to pay for the tobacco bought. Usually the tobacco so bought is redried by the buyer and held subject to the owner's shipping orders. This method of conducting the business necessitates redrying machinery and large storage space.

The other method is where a dealer buys tobacco on his own account. He may have others buying on commission

for him, but he pays his own money for the tobacco and the tobacco is his. He may redry it himself or he may have others redry it for him. He usually stores it in a public storage plant, frequently near a seaport. He seeks a purchaser, domestic or foreign, and offers it for sale by sample to any one who may be interested.

Pemberton & Penn used both methods in the conduct of its business. The tobacco it bought on order of the Japanese Government was redried at its plant in Danville and from there shipped to Japan. Most of the tobacco acquired by this corporation was bought for speculation and was redried by others near where bought, shipped to the seaboard and stored until a purchaser was obtained.

In 1937, the Japanese Government severed its business relations with the corporation. Consequently, the corporation had no immediate need for its redrying machinery, equipment and its storage space. The directors unanimously agreed that it was for the best interest of all stockholders to sell the redrying machinery and equipment, and to rent the storage space to the Dan River Mills. This relieved the corporation of the expense of keeping idle machinery which would deteriorate in value, and eliminated the necessity for keeping a large force of employees to work in the redrying plant.

The conditions in Europe in 1939, resulting from the outbreak of World War II, were such that no profitable business could be conducted with the European dealers. No ships were available to transport tobacco, and even if they had been, the European customers were so impoverished that they could not pay for it.

The unsettled and chaotic conditions in the European and Asiatic countries were reflected, certainly in the tobacco business, in this country. This business is highly speculative even under normal conditions. These abnormal conditions made the successful conduct of the business even more uncertain. Confronted with this situation the directors unanimously decided that it was wise, and in keeping with

sound business judgment, to buy little tobacco and to preserve the resources of the corporation so that when conditions became normal the capital would be available for use in its renewed business activity. In accord with this decision, the directors, acting under the authority given the corporation by the 1930 amendment to its charter, invested its idle capital in liquid assets—that is, stocks, bonds and securities issued by other corporations. The result was that at the close of business for the fiscal year ending June 30, 1948, the sum of $338,500.81 was invested as follows: $29,724.07 in the stock of other dealers in leaf tobacco; $158,776.74 in good, conservative stocks listed on the New York Stock Exchange, and $150,000 in United States Treasury bonds.

In 1942, the Government regulated the purchases of all tobacco. It allocated to each leaf dealer a certain quantity which it was permitted to buy. This allotment was based on the quantity the dealer had purchased during a former fixed period. Under these regulations Pemberton & Penn was given the privilege of buying a certain fixed quantity of tobacco. It designated other leaf dealers to buy tobacco in its name, redry it, sell it, and pay Pemberton & Penn $2.50 per hundred for the privilege. These transactions were continued from year to year through the 1945 crop, resulting in a net operating profit to Pemberton & Penn of $126,898.

Appellants contend that these were illegal transactions because the Government, under its regulations, had prohibited any leaf dealer selling its allotment to another. Appellees contend that the transactions were not illegal, but were permitted by the Government regulations. Whether they were legal or illegal is not material to the decision of this case. They were authorized by the unanimous vote of the officers and directors. J. Pemberton Penn was chairman of the board of directors, consented to, and participated in the transactions.

Under these circumstances, J. Pemberton Penn would be estopped from setting up these acts of the corporation as

a ground for dissolution. This being true his personal representatives are likewise estopped. 13 Am. Jur., Corporations, sec. 1295, p. 1165; *Leigh* v. *National Hollow Brake-Beam Co.*, 224 Ill. 76, 79 N. E. 318; 19 Am. Jur., Estoppel, sec. 157, pp. 813, 814; *Kurtz* v. *Farrington*, 104 Conn. 257, 132 A. 540, 48 A. L. R. 259.

Notwithstanding the fact that the Government repealed all regulations regarding purchases of the 1946 crop of tobacco, the directors determined that the conditions were too chaotic and uncertain for the corporation to purchase any part of this crop. This decision resulted in a net loss of $11,638 for the fiscal year ending June 30, 1947. However, the officers of the corporation were retained and paid their regular salaries. This included the salary paid to J. Pemberton Penn.

Appellants contend that a dissolution of the corporation has already begun. This contention is based on the fact that in 1936 a part of the corporation's assets consisted of a large amount of idle cash. Several of the directors had lost money during the depression and needed money to pay their personal obligations. Thereupon each was authorized to withdraw such sums as he needed, not to exceed $100,000, from the capital assets of the corporation. Each of the five directors, from 1936 to 1942, withdrew different amounts for their own benefit, aggregating $385,325. At first these withdrawals were treated as loans for which each officer was required to execute a note on which he paid interest. In 1942 it was decided that no interest would be charged, the notes were destroyed, and the amounts of the withdrawals were no longer regarded as a personal debt, but each party was required to surrender all, or a part of his stock, as security for the amount withdrawn, payable on disposal of the stock.

The following extract taken from the audit of the corporation's books for 1947, is pertinent:

"Loan accounts of three officers at June 30, 1947, and the

number of shares of the company's capital stock held as security for each are listed below.

|  | Amount of Account | Shares Held as Security |
|---|---|---|
| J. Pemberton Penn Chairman of Board | $ 92,197.50 | 850 |
| George R. Penn President | 91,990.23 | 1,000 |
| Elizabeth Penn Carter Vice President | 98,906.59 | 1,450 |
| Total | $283,094.32 | 3,300 |

The accounts of J. Pemberton Penn and George R. Penn were reduced $2,837.80 and $2,776.81 during the year."

While this transaction may have been irregular, each shareholder was treated alike and no preference was given one over the other.

Appellants further contend that inasmuch as the corporation is buying very little tobacco, there is nothing for the officers to do to earn their salaries; that George R. Penn, president, and his son, Richard T. Penn, vice-president, are engaged in conducting the Penn Specialty Company, and are using property of the corporation on which to conduct this private business; that Everett E. Carter, secretary-treasurer, is the duly elected mayor of the city of Danville, and is paid a salary of $6,000 per year as such officer, and that most of his time is devoted to his official duties as mayor; that notwithstanding these facts, the three officers and one other employee are paid salaries aggregating more than $28,000 per year from the corporation, for which they render little, if any, service; and that said compensation is out of proportion to the services rendered.

The evidence for appellees is that the season for activity in the tobacco business is very short—from three to five months—that during the remainder of the year there is very little to do in the business. George R. Penn testified that,

as a hobby, he had conducted a "novelty business" under the name of Penn Specialty Company for more than twenty-five years; that he had never permitted his activities in this business to interfere with his business as officer of the corporation; that the profits, if any, derived from the novelty business were very little.

Carter testified that notwithstanding the work he does for the city he devotes all the time necessary to the conduct of the business of the corporation. While the corporation is not actively engaged in buying and selling tobacco, there is very little for him to do except keep the books.

It appears that the skeleton force of the corporation is kept together during the abnormal times and the salaries of the officials paid with expectation of renewing its activities in the leaf tobacco business. The assets of the corporation are very liquid and when times are propitious these investments may be converted into cash within twenty-four hours for operating capital.

Another ground for dissolution urged by appellants is that the corporation has paid only one dividend ($1.00 per share in 1945) since 1940.

The general rule is that in the absence of a special contract or statute the board of directors, in its discretion, determines whether to declare dividends on the stock, or to apply the earnings and surplus to operating capital, or to some other corporate purpose. If the directors act in good faith, a court of equity usually will not interfere with the exercise of their discretion. However, if the action of the board in refusing to declare a dividend when there are sufficient earnings or surplus not necessarily needed in the business, is so arbitrary, or so unreasonable, as to amount to a breach of trust, such action is subject to judicial review. "If there is any doubt about the propriety of declaring dividends, the directors are justified in resolving the doubt against such action. Ordinarily, the stockholders have no power to control the directors in the exercise of their discretion in determining whether they will declare a dividend."

13 Am. Jur., sec. 677, pp. 675, 676; *City Bank Farmers' Trust Co. v. Hewitt*, 257 N. Y. 62, 177 N. E. 309, 76 A. L. R. 881, Annotations 885.

Appellants contend, with some earnestness, that the principal purpose of the corporation has failed and has become impossible of attainment. This contention is based on that part of the evidence which shows that prior to 1940 the bulk of the business of the corporation was buying for and selling tobacco to foreign customers; that the conditions in Japan rendered it impossible for the corporation to obtain orders for tobacco and that it has made no attempt to regain its European customers.

The evidence shows that for a number of years prior to 1939 the bulk of tobacco bought by the corporation was resold to foreign customers. However, the corporation has always sold some, and intends to sell more, tobacco to domestic customers. It is not limited by the provisions of its charter, or by its past activities, as to where or to whom it may sell its tobacco.

While there have been no sales of tobacco to foreign customers since 1939, the corporation has made profits aggregating $237,944.38. The following figures, taken from the reports of the auditor reveal the net profit and loss over a ten-year period:

| Fiscal Year Ending | Net Profit | Loss |
|---|---|---|
| June 30, 1938 | $ 58,946.30 | |
| June 30, 1939 | 75,760.44 | |
| June 30, 1940 | 5,429.26 | |
| June 30, 1941 | | $ 45,531.76 |
| June 30, 1942 | 53,562.86 | |
| June 30, 1943 | | 25,482.38 |
| June 30, 1944 | 35,835.92 | |
| June 30, 1945 | 26,407.64 | |
| June 30, 1946 | 64,655.07 | |
| June 30, 1947 | | 11,638.97 |
| *Totals* | $320,597.49 | $82,653.11 |

██ The responsibility of formulating general policies of a corporation is lodged in its board of directors. The duty of executing the plans of the board rests upon the officers selected or appointed by the directors. No discrimination should be made between shareholders, either in the formation of the policies, or in their execution. These should be formulated and executed honestly, fairly and for the best interest of all stockholders. Any intentional deviation or departure from such a course, or any corporate device adopted by the management, which results in fraud to the corporate interest and its shareholders is subject to judicial review. However, before the complaining party can successfully invoke the jurisdiction of a court of equity, he must prove gross mismanagement or that there has been an intentional deviation or departure from the duties imposed upon directors and officers, which resulted in substantial injury to him as a shareholder in the corporation. In addition to the authorities cited, see *Green* v. *National Advertising, etc., Co.,* 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784.

The trial court found, and the evidence supports its findings, that the officers and directors of this corporation were not guilty of gross mismanagement, or any fraudulent act. The policies of the directors and the activities of its officers were approved by J. Pemberton Penn as president and director who died in October, 1947. His salary was paid through December 31, 1947. This suit was instituted in May, 1948. During this six month's interval there has been no change in the policies of the corporation or the activities of its officers.

The overall picture appearing from the record is that the directors decided not to buy a large quantity of tobacco during the uncertain war period and during the inflated post war period, because they thought to do so under such abnormal conditions involved a risk of great loss not offset by prospective gain. They simply decided to do business in a very conservative way until there were reasonably

good prospects of making substantial profits. This policy was commended by several disinterested experts in the leaf tobacco business who were thoroughly familiar with the type of business conducted by the corporation.

The officers of the corporation deny that they ever had, or have now, any intention of abandoning its management. Its financial affairs are in excellent shape. Investment of its capital in liquid assets is temporary, and will be converted into cash when needed in the conduct of its leaf tobacco business when the outlook for the business becomes more normal.

Appellants' final contention is that considering the corporate affairs and the liquid condition of its assets, now is a propitious time for dissolution and distribution of its assets in kind among the shareholders. However, this is a question within the sound discretion of the directors who apparently acted in good faith in concluding that it was for the best interest of all stockholders to continue the existence for the purpose of continuing a leaf tobacco business. The circumstances revealed by the evidence do not justify the intervention of a court of equity, at this time, in the internal affairs of the corporation and a substitution of its judgment for the judgment of the board of directors. The decree is

*Affirmed.*