## CIRCUIT COURT OF SCOTT COUNTY

John H. Brown et al., Co-Exor's.
of the Estate of R. J. Harris,
deceased, et al.

v.

Scott County Tobacco Warehouses,
Inc., et al.

February 22, 1983

Case No. (Chancery) 1549

By JUDGE S. W. COLEMAN, III

This chancery proceeding pending before the Circuit Court of Scott County was instituted by the personal representatives of the estate of R. J. Harris who was a forty-four percent minority stockholder of Scott Tobacco Warehouses, Inc. The respondents are the corporation and J. E. Cozart, the president, fifty-one percent majority stockholder of the corporation and a member of the board of directors; Joan Cozart, wife of J. E. Cozart and vice-president, assistant secretary-treasurer, a one share

stockholder and a director of the corporation; Eliza Cozart, mother of J. E. Cozart and a director of the corporation; James McPatterson, nephew of J. E. Cozart and a director of the corporation; and G. A. Kiser, W. J. Franklin and John R. Bussell, local businessmen and farmers who are directors of the corporation and minority stockholders. The bill of complaint seeks liquidation of the corporation pursuant to § 13.1-94 of the Code, relying primarily on subparagraphs (a) "(2) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; and. . . . (4) That the corporate assets are being misapplied or wasted." The respondents generally deny the allegations but assert, in the alternative, that the personal representatives of R. J. Harris should be estopped from seeking such relief because the acts complained of, even if tending to be in contravention of the statute, which the respondents deny, were the same course of business practice followed by R. J. Harris and others when they were controlling directors and officers of the corporation.

While all counsel are very familiar with this corporation, a very brief review of its history appears in order. In 1952 the corporation was originally formed by 130 local stockholders as Scott County Recreation Authority. Soon thereafter the corporation was converted to Scott County Tobacco Warehouses, Inc., consisting primarily of local farmers and had as its purpose the development of a local tobacco market so the farmers would not have to travel to more distant markets. The corporation was operated by local interests for four years, at which time approximately 80 percent of the stock was sold to outside interests consisting of R. J. Harris and J. T. Harris, Joe Pell and Clarence Joyce and a Mr. Huggins and Mr. Townsend who appear to have been experienced tobacco operators primarily from North Carolina. James E. Cozart became a major minority stockholder in 1959. It is suggested from the record that during the early years of the corporation that the Harris interest primarily directed the policy of the corporation by virtue of J. T. Harris being the president and the Harrises having considerable influence with and serving on the board of directors. In 1972 J. E. Cozart became majority stockholder, at which time he immediately called a stockholders meeting electing new officers of the corporation, effecting changes in the by-laws and constituting a new board of directors.

J. E. Cozart was elected president and named to the three member board of directors; Joan Cozart was elected vice-president and elected to the board of directors; H. B. Quillen, Jr., was elected secretary-treasurer and the third member of the board of directors was Mr. John B. Hemmings, attorney of J. E. Cozart. This change in the corporate officers and directors and by-laws resulted in litigation which ultimately was reviewed by the Supreme Court of Virginia and held to be in compliance with Virginia law in *Scott Co. Tobacco Whses.* v. *Harris*, 214 Va. 508 (1974). In 1973 the board of directors was increased from three to five members adding Goldie Kiser and James Franklin with Eliza Cozart, mother of J. E. Cozart, replacing Mr. Hemmings at some interval, leaving the Cozart interest with a three-member majority of the five-member board. In January of 1976 two additional directors were elected increasing the board to seven with the addition of James McPatterson, nephew of J. E. Cozart, and John R. Bussell, leaving the Cozart interest with a four-member majority of the seven-member board. The complainants contend that the actions of J. E. Cozart and the board of directors since the "take-over" in 1972 should be scrutinized by the court without regard to the business dealings of the corporation pre-1972 in determining whether such acts were illegal, oppressive or fraudulent as to minority stockholders or whether the corporate assets have been wasted or misapplied; the respondents contend that the court must consider the entire history of the corporation in determining whether J. E. Cozart and the various boards have effected any change in policy that might be considered illegal, oppressive or fraudulent and for comparative financial purposes to determine whether the officers and directors since 1972 have wasted or misapplied the assets, as well as determining the issue of estoppel. Suffice it to say here, for reasons to be more fully commented on that the court considers the entire history of the corporation both relevant and material to all of the issues before the court for resolution, i.e. (1) whether the acts of J. E. Cozart and the directors have been oppressive, illegal or fraudulent as to minority stockholders; (2) whether the corporate assets are being wasted or misapplied; and (3) whether the complainants or their predecessor in interest were guilty of such conduct that they should be estopped from seeking the relief of liquidation here sought. The pertinent conduct

of the business of the corporation by and through its officers and directors will be more fully discussed in the text of this opinion.

### History of The Virginia Statute

Code § 13.1-94, suggested by the Model Business Corporation Act, ABA-ALI Model Bus. Corp. Act § 90 (1953), was adopted in its original form in 1956 in the general revision of the laws relating to corporations. Acts of Assembly, 1956, c. 428.

Oppression as a ground for corporate dissolution would appear to be of fairly recent origin. The statutory recognition of this ground first occurred in Illinois in 1933. *Central Life Ins. Co.* v. *Davis*, 10 Ill. 2d 566, 572, 141 N.E.2d 45, 59 (1957). By 1965 at least eleven other states, including Virginia had adopted similar statutes. See 1965 Duke L. J. 128.

The word "oppressive," as used in the statute does not carry an essential inference of imminent disaster; *it can contemplate a continuing course of conduct*. The word does not necessarily savor of fraud, the the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent" [although those grounds too are codified as reasons justifying liquidation of the corporation.] *Central Life Ins. Co.* v. *Davis, supra*; *Gidwitz* v. *Lanzit Corrugated Box Co.*, 20 Ill. 2d 208, 215, 170 N.E.2d 131, 135 (1960).

The (British) Companies Act of 1948, 11 & 12 Geo. 6, C. 38, S. 210 permits relief to be granted to a stockholder where "the affairs of the company are being conducted in a manner oppressive to some part of the members." In this context it has been held that oppressive means "a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his

money to a company is entitled to rely." (Citation omitted). It has also been held to mean "a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." (Citation omitted; emphasis added). *White and P & W Oil Co.* v. *Perkins*, 213 Va. 129, 134 (1972).

Prior to Virginia's 1956 enactment and 1968 amendment of § 13.1-94 of the Code establishing illegal, oppressive or fraudulent acts by officers or directors of a corporation or waste and mismanagement of corporate assets as grounds for liquidation, Virginia courts of equity had the inherent power to dissolve a solvent corporation, but only upon proof that the directors or a majority of the stockholders had been "guilty of fraud or gross mismanagement, or where the principal purpose for which the corporation was formed has become impossible of attainment." *Penn* v. *Permberton & Penn*, 189 Va. 649, 653 (1949). There have been relatively few reported Virginia cases seeking liquidation of a corporation pursuant to Section 13.1-94 of the Code. See *Baylor* v. *Beverly Book Co.*, 216 Va. 22, 216 S.E.2d 18 (1975), and *White* v. *Perkins, supra.*

Before directing its attention to the specific acts complained of in determining whether the acts of the officers, directors or majority stockholders have been illegal, oppressive or fraudulent or whether the corporate assets have been mismanaged or wasted, this court must first define the general duties of the officers, directors and majority stockholders, *vis-a-vis* the corporation, minority stockholders and creditors.

### General Duties of Officers, Directors and Majority Stockholders of Corporations and Burden of Proof

A director is a fiduciary. (citation omitted) So is a dominant or controlling stockholder or group of stockholders. (citation omitted) Their powers are powers in trust. (citation omitted) Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is

on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (citation omitted) The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an *arm's length bargain. Pepper* v. *Litton*, 308 U.S. 295, 306 (1939).

He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation. *Pepper* v. *Litton, supra*, 311.

Citing directly from the complainants' legal memorandum, the duties of officers, directors and majority stockholders of a corporation, as well as the burden of proof to overcome the presumption that transactions between the corporation and its officer, director or majority stockholder are presumed invalid, are well-defined.

Some examples of what can constitute a breach of fiduciary obligation are: Use of corporate power or property for the fiduciary's own benefit rather than the benefit of all shareholders; and usurpation by a fiduciary of an opportunity properly belonging to the corporation. And, as a Federal Court has said, majority shareholders "owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock and to secure and deliver to them their just proportion of the income out of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property to deprive the minority holders of their just share of it or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust which invokes plenary relief from a court of chancery." *Oppression of Minority Stockholders*, p. 509. See also *Fill Bldgs., Inc.* v. *Alexander Hamilton Life Ins. Co.*, 396 Mich. 453, 241 N.W.2d 466 (1976).

It is not only the Supreme Court of the United States which has placed the burden of proof on a majority stockholder who contracts with his own corporation. The Supreme Court of Virginia in the case of *Adelman* v. *Conotti Corp.*, 215 Va. 782, at page 789 (1975), states that such transactions are prima facie presumed to be invalid:

Under Virginia law an officer of a corporation, in his dealings with the corporation, has the same duty of fidelity which arises in dealings between a trustee and a beneficiary of the trust. (citation omitted). Where a trustee deals with the *cestui que trust*, such transactions, while not *ipso facto voidable*, are *prima facie* presumed to be invalid and the fiduciary

must bear the burden of proving that the transaction was fairly conducted. (citation omitted).

In *Rowland* v. *Kable*, 174 Va. 343, 6 S.E.2d 633 (1940), we outlined the principles which apply to a director dealing with his corporation:

"The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation. This does not mean that he may not deal with his corporation or sell his property to the corporation if the transactions are open, fair and honest, *and* the corporation is represented by competent and authorized agents. The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation. The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he *may* be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury." *Id.* at 366, 6 S.E.2d at 642 (emphasis added).

We hold this same fiduciary duty applies to the conduct of the officers and directors of a corporation in their dealings with the corporation's stockholders. *Adelman*, *supra*, at 789 and 790. *See also Rowland* v. *Kable*, 174 Va. 343, at p. 366 and 367 (1940).

This holding is now in statutory form. *See* Va. Code § 13.1-39.1.

*Findings of Fact and Conclusion of Law*

Scott County Tobacco Warehouses, Inc., owns four tobacco warehouses and the property upon which they are situated in Weber City, Virginia, known as Farmers Warehouses Nos. 1 and 2 and Big Star Warehouses Nos. 1 and 2 together with a building and property known as the Legion Building. The corporation derives its income solely from rental received from the leasing of the warehouses to J. E. Cozart, as operator, based upon 30% of the commissions derived from the sale of tobacco, and rental to other tenants of warehouse space, the major ones being Mini Fibers which pays a monthly rental of $2,100, Clarke Diesel at $400 monthly and Gateway Auction at $300 monthly. In 1972 and before, the operators apparently paid Scott County Tobacco Warehouses, Inc., rental of the warehouses under a similar arrangement with an operating partnership at the rate of 25% of the commissions derived from the sale of tobacco. In 1977 Scott County Tobacco Warehouses, Inc., purchased a tobacco warehouse in Rogersville, Tennessee, for $145,000 which was also leased to J. E. Cozart as operator under essentially the same terms of 30% of the commissions derived from the sale of tobacco. Complainants' real estate appraisal valued the Rogersville Warehouse at $214,000. Additionally, J. E. Cozart owns personally and operates under a partnership arrangement two tobacco warehouses in Weber City, Virginia, known as Cozart Nos. 1 and 2. J. E. Cozart either owns personally or another corporation over which he is president, Cozart Tobacco Warehouse, owns warehouses in Abindgon, Virginia, Nashville, Georgia, and Pennington Gap, Virginia. The corporation also owns personal property consisting primarily of tobacco weighing scales valued in the neighborhood of approximately $10,000 located in the warehouses. Since its inception Scott County Tobacco Warehouses, Inc., has paid no dividends to its stockholders. Between 1973 and 1980 the corporation's profit-loss picture has shown losses varying from ($6,381.25) in 1978 to ($24,413.82) in 1973 except for 1975 and 1976 which showed profits of $13,516.02 and $8,520.07, respectively; however, in each year since 1973 there has existed a deficit in retained earnings varying from ($2,994.31) in 1973 to a high of ($56,059.60) in 1980. The respondents emphasize that prior to J. E. Cozart's becoming chief operating officer, director and majority stockholder

of the corporation that his predecessors had permitted the primary capital assets, the warehouses, to deteriorate greatly. Cozart characterized his initial years in office as undertaking a vigorous revitalization campaign in which large expenditures were made to re-roof the warehouses in order to preserve and extend their useful life. He explained the fluctuations in the profit/loss picture due to annual fluctuations in the quality and quantity of tobacco; he explained the increases in salaries and directors' fees in detailing his duties and those of others and explained the various factors that comprise the large total operating expenses in comparison to income. Cozart acknowledged that the corporation had purchased from time to time small amounts of stock from individuals which was being held as treasury stock and that no offer was made to all minority stockholders to purchase equivalent amounts; he did not personally recall whether there existed a capital surplus or surplus in retained earnings at the time or whether such had been restricted when such purchases were made. Various other aspects of corporate decisions and policies as well as the evaluation of corporate assets and financial transactions were explained by Mr. Cozart and the witnesses and exhibits submitted on behalf of the respondents.

The complainants contend in their memorandum that a series of events occurring since J. E. Cozart assumed control of the corporation, viewed singularly and in combination, reflect a continuing pattern of conduct and intention to utilize the corporation and its assets for his own personal gain at the expense and to the detriment of the minority stockholders. Such manipulation of the corporation and its assets is asserted to be in some instances illegal and in others oppressive, if not fraudulent, to the rights of the minority interests. Allegations of waste and mismanagement of corporate assets in the sense that they are manipulated for the personal benefit of J. E. Cozart rather than for the entire benefit of the corporation, including the minority stockholders, is alleged. First, the complainants protest the action of J. E. Cozart immediately after becoming majority stockholder in changing the corporate officers and directors. The legal propriety of such action was affirmed by the Supreme Court of Virginia; however, such legal changes would not condone the newly elected officers undertaking an illegal or oppressive policy of corporate management

if the changes were for that intention. The burden to prove such rests with the complainants and must be judged in light of then existing as well as subsequent events. The evidence suggests that prior to 1972 the warehouses had deteriorated greatly and a change in management may have been justified to preserve corporate assets. Conversely J. E. Cozart testified that at some point prior to 1972 he was a partner in the operating partnership of the corporation sharing in the tobacco sales commissions; apparently at some point in time this changed and Cozart testified that R. J. Harris "walk[ed] up to me and [said] 'I will see that you never get a dime for your stock.' " (deposition 7/25/81, p. 23). As to whether J. E. Cozart after becoming majority stockholder may have been motivated by a similar sentiment to that of R. J. Harris must be judged in light of subsequent events; however, the "mere changing of the guard" or agreement to indemnify officers and directors for damages as authorized by Section 13.1-3.1 of the Code or changes in the by-laws as to who chaired the shareholders' meeting do no more than to show a legal means in affecting the ability to direct corporate policy. It must be noted, however, that the obvious intent to maintain control of the corporation within the Cozart family by placing them as officers and controlling directors must necessarily subject their subsequent dealings with the corporation personally to the very closest judicial scrutiny.

Next the complainants protest about the periodic increases in salary and directors' fees since 1972 and the agreement to pay Cozart's out-of-pocket and transportation expenses. While the percentage of increase may appear large between 1972 and 1980 the amounts cannot be found to be exorbitant for the duties and responsibilities of the officers and directors; however, it must be observed that according to J. E. Cozart neither Joan Cozart, Eliza B. Cozart nor James McPatterson have ever attended a directors' meeting. The propriety of paying directors' fees for no services rendered as well as the propriety of directors totally disregarding their fiduciary responsibility must be cause for concern; however, such, standing alone, does not constitute oppression or mismanagement or waste sufficient to justify liquidation unless it be shown that such nonfeasance did, in fact, have such a result upon corporate assets in the discharge of corporate policy. Nevertheless, such situation is further

evidence of the extent of control of the corporation exercised by J. E. Cozart and must be borne in mind in scrutinizing other transactions.

Third, the complainants note that at various times since 1972 the corporation has purchased from individual shareholders during periods in which there existed deficits in retained earnings and earned surplus small blocks of stock which were held as treasury stock without restricting either earnings or surplus. Complainants further contend that such constituted a preference of certain minority stockholders over others since a select few were permitted to recover all or a portion of their investment which was producing no return while others had no opportunity to do so. In 1972 10 shares were purchased from A. E. Cleek at $140.00 per share; in 1973 10 shares from Rosa Gardner at $140.00 per share; in 1974 2 shares from J. W. Culbertson at $140.00 per share; in 1975 2 shares from Alice Lane, 15 shares from Dr. B. K. Barker, 10 shares from Opie Tiller and 10 shares from Clara Odle at $150.00 per share; in 1976 20 shares from W. C. Salyer at $150.00 per share and an unspecified number from Wylie Bradshaw at $150.00 per share--a total of, at least, 79 shares at a value of $11,630. In each of those years there existed a deficit in retained earnings and no capital surplus; there is nothing to indicate that in 1972 that any restriction was placed on retained earnings for the purchase of treasury stock. § 13.1-4 specifically prohibits the right of a corporation to purchase its own stock "only to the extent of earned surplus available therefor or capital surplus" and even then such must be restricted. The purchase of the treasury stock was clearly in violation of § 13.1-4 of the Code, which does have an adverse effect upon stockholders. The purchase of stock when there exists no retained earnings or capital surplus has the effect of reducing the capital assets of the corporation and in effect depleting the stockholders' investment and par value of their stock. Such contracts are invalid and may subject the officers or directors to personal liability. Such acts would constitute waste of the stockholders' assets as well as acts in violation of § 13.1-4 of the Code.

As to whether the purchase of small amounts of treasury stock from selective shareholders, without extending the same opportunity to all, would constitute a preference in derogation of the rights of all stockholders has not

been specifically litigated in Virginia. The complainants rely primarily upon language from *Penn* v. *Pemberton*, 189 Va. 649, 660 (1949), that "No discrimination should be made between shareholders, either in the formation of the policies, or in their execution," and a situation analogous to that at bar from the Supreme Court of Georgia in 1978:

> Good faith is not just a question of what is proper for the corporation. It also requires that the stockholders be treated fairly and that their investments be protected. In close corporations, minority stockholders may easily be reduced to relative insignificance and their investment rendered captive, because ordinarily there is no market for minority stock in a close corporation and a minority stockholder cannot easily liquidate his investment for its true value. . . . The minority stockholder has an interest in the liquidity of the corporation. He looks to the earned surplus for payment of dividends. In such purchase his own interests are depreciated and used to render him ineffective and "freeze" his investment. In our opinion such action by directors demonstrates a lack of good faith. . . . Directors may decide in good faith what is best for the corporation, but this interest must be consistent with good faith to the minority stockholder. Under the circumstances here, we hold that good faith requires the directors to authorize a corporation purchase of Felix' stock at the same price and the same terms given to Christine. *Comolli* v. *Comolli*, (Ga.) 246 S.E.2d 278, 281.

Considering that, the purchase of treasury stock at times when there existed no surplus in retained earnings or capital surplus, without offering an equal opportunity to all shareholders for no justifiable reason, constitutes a preference which has the effect of both "freezing" the interest of some shareholders who have never received any return on their investment while simultaneously committing waste by depleting their investment in purchasing treasury stock from capital assets.

The 1977 purchase of a warehouse in Rogersville, Tennessee, by the corporation which was immediately leased to J. E. Cozart has been challenged as an improvident business decision, not in the best interest of any stockholder, except Cozart. The complainants emphasize that the purchase was made at a time in which the corporation had insufficient funds to justify the $145,000 purchase and there could be no expectation under the circumstances, nor has the property, in fact, generated sufficient revenue to amortize the loan of $104,000 or pay taxes, insurance or other expenses. According to Cozart the corporation has received approximately $9,000 annually from the tobacco sale commissions which has fallen $3,000 per year short of the amortization payments. The respondents on the other hand, emphasize that the commission warehouses can assess in Tennessee is 5% rather than the 3% in Virginia, and note that the appraised value by the respondents of $241,000 demonstrates the sound judgment of the decision to purchase. The respondents attribute recent revenue shortfalls to poor tobacco crops and express hope for an improved profit picture with better crops. Even if the decision to purchase the Tennessee warehouse is considered an unwise business judgment, a corporation cannot be dissolved because its officers or directors may have made a wrong business decision. The court cannot in retrospect substitute its judgment for that of the corporate officers and directors. This court is of the opinion that the evidence fails to establish that the decision to purchase the Tennessee warehouse was bad business judgment; certainly the evidence fails to establish that such act was one of oppression, fraud or illegality nor constituted waste or mismanagement of corporate assets.

The utilization of the warehouses, including the Tennessee houses, is the most critical issue before the court because such involves the primary purpose and operation of the corporation and is the sole method by which it can generate revenue for its stockholders. It should be borne in mind that corporations may exist for reasons other than producing revenue for its shareholders; to some extent, such appears the situation initially with Scott County Tobacco Warehouses, Inc., in which the stockholders were primarily motivated in establishing a local market for their tobacco. When other than local farmers purchased the controlling interest of the corporation, however, the profit motive was an important aspect of

corporate policy. Since the warehouses have both before 1972 and thereafter, when Cozart became the dominant stockholder, director and president, been leased to an operator or group of operators who were either officers or directors, the propriety of such transactions must be scrutinized closely. In summary, the applicable legal guidelines are that a director, officer or dominant stockholder is a fiduciary and "[t]heir dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." (citation omitted) The officer, director or dominant shareholder must carry the burden of proving that the transaction meets the criteria of an "arm's length bargain" and does not violate the rules of fair play or that he did not receive some preferred advantage or use corporate assets for his personal gain to the detriment of the corporation or other stockholders. Virginia has codified such principles approving contracts between the corporation and its principals when all facts are known or the principal proves that "the contract or transaction was fair and reasonable to the corporation in view of all facts known":

> Section 13.1-39.1. Officer and director conflicts of interest. - (a) No contract or other transaction between a corporation and one or more of its officers or directors or in which one or more of its officers or directors are interested and no contract or other transaction between a corporation and any other corporation, firm, association or entity in which one or more of its officers or directors are directors or officers or are interested, shall be either void or voidable because of such relationship or interest or because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes, approves or ratifies such contract or transaction or because his or their votes are counted for such purpose provided that the material facts as to his or their relationship or interest are disclosed

or known: (i) To the board of directors or committee which authorizes, approves or ratifies the contract or transaction by a vote sufficient for the purpose without counting the votes of such interested directors; or (ii) To the stockholders entitled to vote and they authorize, approve or ratify such contract or transaction by vote or written consent. (b) In any event no contract or other transaction described in subsection (a) of this section shall be void or voidable despite failure to comply with parts (i) or (ii) of subsection (a), provided that such contract or transaction was fair and reasonable to the corporation in view of all the facts known to any officer or director at the time such contract or transaction was entered into on behalf of the corporation. In an action to obtain relief for the corporation on account of a contract or other transaction described in subsection (a) in which there was no compliance with parts (i) or (ii) of subsection (a) such contract or transaction may be voided for the benefit of the corporation and the court may grant other appropriate relief unless the party seeking to uphold the contract or transaction sustains the burden of proving that such contract or transaction complied with the requirement of the first sentence of this subsection (b).

Has J. E. Cozart proven that all pertinent facts were known to those directors approving the lease agreements for operation of the warehouses or has he overcome the presumption of invalidity and shown the lease agreements to be fair to the corporation or minority interests? J. E. Cozart was the only director who testified. As to what was known to the others is unclear from the record, however, since Joan Cozart, Eliza Cozart and J. McPatterson have never attended a director's meeting their knowledge of the pertinent aspects of the lease cannot be presumed. Cozart and his counsel undertake to prove that the 30% commission of tobacco sales is a fair and reasonable return and lease arrangement because he increased the amount from 25% which he originally paid and his predecessor paid. However, the fallacy in such argument is the

premise that the former 25% was a fair and reasonable rental payment. Cozart at no time undertook to establish what was a prevailing rate of return in the industry or in other lease arrangements, even though invited to do so by the court (p. 202 of transcript). In fact, the evidence of Cozart states unequivocally that no one undertook to negotiate with other operators to determine whether a better rate of return could be secured for the corporation. Mr. Cozart suggests that he would not consider renting the operation to anyone but himself (p. 47 of transcript). However, while Cozart attempts to indicate that the lease which he has with Scott County Tobacco Warehouses, Inc., was fair in which he as operator receives 70% of the commissions, with the corporation receiving 30% and bearing the considerable expense of maintenance, repairs, taxes and insurance, his own evidence as to the operation of other warehouses including Cozarts Nos. 1 and 2, which he either owns personally or leases from other corporations under an operating partnership, suggests that the ownership interest in those leases receives a 70% or 75% return on commissions while the actual operator receives either a 25% or 30% return of commissions. If an actual operator is able and willing to perform his duties for commissions of 25% or 30%, the remaining profits should inure to the benefit of the corporation, not J. E. Cozart personally. It has not been demonstrated that Cozart personally performs any task as operator to justify his personally sharing in commissions that rightfully should belong to the corporation to which he has a fiduciary duty and for which he is adequately compensated. In attempting to meet his burden of proof, Cozart offers no evidence that the 70% commissions to the operator is fair, reasonable or just; in fact, the record is devoid of evidence showing the profits or losses incurred by the operator, although readily available to Cozart. Exhibit 6 as well as the testimony of J. E. Cozart and H. B. Quillen, Jr., indicates that Scott County Tobacco Warehouses, Inc., generates just sufficient revenue to maintain, preserve and repair the warehouses which are used in such a manner as to generate personal income for the operator, which is J. E. Cozart. A corporation cannot be exploited for the personal gain of its officers, directors or a dominant stockholder. A corporation cannot be "used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or

form of corporate management, has treated its affairs as his own." *Pepper* v. *Litton, supra,* p. 309.

The court is of the opinion that the respondents' evidence fails to show that the directors were even aware of the material facts of the lease agreement or that the lease transactions were fair or reasonable to the corporation or had any of the indicia of an arm's length bargain. Proof by the respondents that a lesser commission (25%) was paid as a rental before Cozart assumed controlling interest, does little more than support respondents' contention that the controlling interest prior to Cozart also exploited the corporation and acted in an oppressive manner to other minority interests. Mismanagement and waste of corporate assets can result as much from the assets being utilized for the personal benefit of a few as it can from deterioration, misuse, inefficiency, destruction, loss or other more common meanings. The evidence suggests that even before Cozart assumed control that corporate assets were used for the personal benefit of a group of operators, in which Cozart at one time shared. The history of this corporation shortly after its inception in the 1950's indicates that it has been used for the personal benefit of a few and the numerous factors previously discussed since 1972 in which control has been almost exclusively by J. E. Cozart shows the same to have been operated for his personal advantage in a manner oppressive to minority interests.

While the complainants emphasize that Cozart is personally in competition with Scott County Tobacco Warehouses, Inc., by operating his own warehouse in the Weber City Market, such is of little import in view of the terms of the lease arrangements which he has established. Certainly the potential exists for Cozart personally to be in competition with the corporation in which he is an officer, director and dominant stockholder and to which he has a fiduciary duty. But, as Cozart demonstrated, Scott County Tobacco Warehouse has consistently obtained a larger percentage of the tobacco sales since he assumed control than before. However, because of the lease arrangements he has negotiated, he has removed the need to be in competition with his corporation. If the tobacco is marketed at Scott County Tobacco Warehouse, Inc., where he is operator and majority stockholder he will receive the equivalent percentage of commissions that he would from Cozarts Nos. 1 and 2 where he is owner

and operator. In both, the actual operator receives approximately 35% of commissions (½ of 70%) but in the latter the 35% of commissions goes to the owner-operator while in the former, the share which would go to the owner, Scott County Tobacco Warehouses, Inc., is paid to J. E. Cozart personally.

The court is of the opinion that the lease arrangements between the corporation and Cozart have not been shown to be fair and reasonable to the corporation and the minority stockholder, but to the contrary, from Cozart's own evidence concerning other leases in which he is involved the fair rate of return between the actual owner and actual operator would be in the range of 70% and 30%, respectively. In view of the fact that the management of this major asset of the corporation is being used for the benefit of its dominant stockholder rather than the corporation and that the control of the corporation appears to be almost exclusively with J. E. Cozart and that treasury shares have been purchased from capital assets, together with those incidents previously noted which indicate an intention to use corporate assets for personal gain, the court is of the opinion that the president, director and majority stockholder has mismanaged and wasted corporate assets insofar as the interest of the corporation and minority stockholders are concerned and has been oppressive to their interest.

As to the issue of estoppel, the court is of the opinion that the respondents' reliance upon *Penn v. Pemberton, et al*, 189 Va. 649 (1949), is misplaced. In *Penn* the petitioners were estopped from seeking relief because the complainants' deceased had actually engaged in and participated in the illegal act of which they complain. The case is inapposite to the situation at bar. While this court has concluded that the controlling interest prior to 1972, including the Harris interest, managed the corporation for their personal benefit to the detriment and oppression of minority interests by leasing the warehouses to themselves under favorable terms; nevertheless, that course of conduct ended and did not continue insofar as the Harris interest was concerned when Cozart assumed control. No longer could it be said that the complainants were engaged in illegal or oppressive conduct nor was oppressive conduct by the Harris interest the basis for seeking relief in the case at bar as was true in *Penn v. Pemberton, supra*.

## Conclusion

The court having concluded that oppression, mismanagement and waste of corporate assets has occurred and prevailed for almost the entire existence of Scott County Tobacco Warehouses, Inc., must now consider the relief to be granted by a court of equity either under common law principles or statutory authority. As respondents note, liquidation of a corporation is an extreme remedy and should not be considered lightly; citing from both Oregon and Texas precedent, the respondents note:

> [L]iquidation is not available upon a showing of mere vague apprehensions of possible future mischief or injury or to extricate minority shareholders from an investment that turns out to be a bad bargain. We also reject the concept that a "closed corporation" is like a partnership to the extent that a minority shareholder should have the same right as a partner to demand a dissolution of the business upon substantially the same showing as may be sufficient for the dissolution of the partnership. After all, the remedy of a forced dissolution of a corporation may equally be "oppressive" to the majority shareholders. *Baker v. Commercial Bodybuilders, Inc.*, 507 P.2d 387 (Ore. 1973).

> We agree with the practically unanimous judicial opinion that liquidation of solvent going corporations should be the extreme or ultimate remedy, involving as it usually will, accentuation of the economic waste incident to many receiverships and most forced sales. *Patton v. Nicholas*, 279 S.W.2d 848, 857 (Tex. 1955).

Nevertheless, in view of the findings that the oppressive acts pervade the very purpose and primary operation of the corporation in leasing its major asset, the warehouses, and in view of the acts of oppression, mismanagement and waste having prevailed throughout the life of the corporation, considered together with the apparent intention of Cozart to continue to utilize corporate

assets for his personal gain, the court perceives no remedy short of liquidation which will afford to the minority stockholders any relief in recovering their investment which has been "frozen" for such a long period of time. Accordingly, counsel shall prepare a proposed decree directing liquidation of the corporation in accordance with Section 13.1-95 of the Code, leaving a space for the court to appoint a liquidation receiver.