# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Kurtis Parsch et al.

v.

Ivor Massey, Jr., et al.

November 5, 2009

Case No. 04-193

BY JUDGE EDWARD L. HOGSHIRE

*Findings of Fact and Conclusions of Law
Regarding Sanctions and Indemnification*

On November 17 and 18, 2008, the Court conducted an *ore tenus* hearing wherein evidence was presented with respect to Counterclaim Plaintiffs' motion for sanctions and claims for indemnification against Counterclaim Defendants, and whereas the parties have submitted proposed Findings of Fact and Conclusions of Law subsequent to oral argument on August 19, 2009, and whereas the Court has considered the evidence presented, legal memoranda, authorities submitted by all parties, and the arguments of counsel, the Court hereby renders the following Findings and Conclusions as a resolution of these issues.

*Findings of Fact*

*Procedural History*

On December 10, 2004, Neal Walters, as counsel for the Plaintiffs, including Kurtis F. Parsch, Barbara Paskoff, Bradley Smallwood, all who were shareholders of Tovaris, Inc. ("Tovaris"), filed a Bill of Complaint ("Original Complaint") against the Defendants, seeking equitable and injunctive relief for breach of fiduciary duty, breach of the shareholder's agreement, fraudulent transfer and conversion of assets, and fraud. (Original Compl. at 8–11.) Plaintiffs claimed that Defendants deprived Tovaris shareholders of their investment value by entering into a loan transaction with Triad, L.C. ("Triad"), which the parties have designated as the Triad Bridge Loan ("TBL"). (Original Compl. at 3–4.) The named Defendants included: Ivor Massey, Jr., Richard F. Gorman, III, Richard W. Gordon, Samuel G. Patterson, Jonathan S. Tunner, Roland S. Gerard, Stanley K. Joynes, III, Gary McGraw, Sanford Teu, Sanjay Vakharia, M. Bernard Siegel, Roy Stephan, Robert Starling, Tovaris, and Triad. (Original Compl. at 3.)

On December 20, 2004, Plaintiffs filed an Amended Bill of Complaint ("Amended Complaint"), adding Harry Lankenau, Tovaris I.P., L.C. ("Tovaris I.P."), and GlobalCerts, L.C. ("GlobalCerts") as Defendants. (Am. Compl. at 3–4.) The Amended Complaint contained eight counts: the Claim of Breach of Investor Rights Agreement (Count VII); the Accounting Claim (Count IV); the Fiduciary Duty Claims (Counts I and IV); and the Fraud Claims (Counts II, III, V, and VIII).

Count I was a derivative claim for breach of fiduciary duty, alleging that the Defendants were directors of Tovaris, and as such were fiduciaries of the shareholders, and breached their fiduciary duties by recklessly approving the TBL transaction knowing that it would benefit Massey and Triad and harm Tovaris and its shareholders. (Am. Compl. at 10–12.)

Count II alleged that the TBL transaction was a fraudulent conveyance of assets, intended and designed by the Defendants as a means to transfer for less than full and fair consideration the assets of Tovaris to Triad or other entities owned or controlled by Defendants. (Am. Compl. at 12.)

Count III alleged that the TBL transaction constituted a conversion of valuable assets of Tovaris and that Defendants, through exercise of authority over property of Tovaris, deprived Tovaris of possession of its assets. (Am. Compl. at 12–13.)

Count IV alleged that the Defendants failed to account to shareholders for the collection and disbursement of proceeds of the foreclosure sale against Tovaris. Plaintiffs alleged that the Defendants realized far more value from the sale than the amount of the loan owed by Tovaris to Triad. (Am. Compl. at 13–14.)

Count V alleged that Defendants intentionally, negligently, or recklessly made misstatements and omissions of material facts for the purpose of inducing Plaintiffs to approve the TBL transaction and to refrain from seeking better alternative financing and that Plaintiffs were damaged as a result of their reliance on such misstatements or omissions. (Am. Compl. at 14–15.)

Count VI was a direct claim for breach of fiduciary duty, alleging that Massey controlled Tovaris, either directly or through the entities he controlled and, as such, owed a duty to refrain from actions that would harm non-controlling shareholders. Count VI alleged that the other Defendants breached their fiduciary duties by approving the TBL transaction. (Am. Compl. at 15–16.)

Count VII alleged that the Defendants breached the Investors Rights Agreement by failing to give Parsch and Paskoff notice or the right to participate in the offering of new Tovaris securities. (Am. Compl. at 16–17.)

Count VIII alleged that the actions of Massey, Gordon, and Patterson were taken deliberately, wantonly, and recklessly in conscious disregard of the financial interests of the Plaintiffs, as minority shareholders, and, as such, Plaintiffs were entitled to recover punitive damages.

On January 30, 2006, the following Defendants ("Counterclaim Plaintiffs") filed a Counterclaim against the Plaintiffs and their counsel ("Counterclaim Defendants"): Massey, Gorman, Tunner, Gerard, Joynes, Triad, Tovaris I.P., and GlobalCerts.

In Count III of the Counterclaim, the Counterclaim Plaintiffs demanded that the Court impose sanctions under Virginia Code § 8.01-271.1 jointly and severally against the Counterclaim Defendants. The Counterclaim Plaintiffs alleged that (1) the Counterclaim Defendants failed to conduct a reasonable inquiry, which would have revealed that the Counterclaim Defendants were never directors of Tovaris in 2001 and neither Massey nor Gorman were ever directors of Tovaris; and (2) the Amended Complaint was not well grounded in fact and warranted by existing law. (Countercl. at 11–12.) In Count IV of the Counterclaim, the Counterclaim Plaintiffs claimed indemnification under Va. Code § 13.1-672.5 for expenses incurred in defending the litigation. (Counterclaim 12–13.)

On February 27, 2006, Counterclaim Defendants filed an Answer to the Counterclaim. (Counterclaim Defendants' Answer dated February 27, 2006.)

On October 4, 2006, this Court sustained the Defendants' demurrer regarding fraud and demand futility claims. (Court's Opinion dated October 4, 2006 [72 Va. Cir. 121].)

On October 24, 2006, Plaintiffs filed a Second Amended Complaint, naming Gordon, Patterson, Tovaris, Triad, Tovaris I.P., and GlobalCerts as defendants, resolving all capacity issues. (Counterclaim Defendants' Second Amended Complaint dated October 24, 2006.)

On November 14, 2006, Defendants filed the following in response to the Second Amended Complaint: a Demurrer; Special Pleas of the Statute of Limitations, *Res Judicata*, and Collateral Estoppel; a Motion to Dismiss for Failure to Effect Service Within One Year; a Motion to Strike; a Counterclaim; and a Motion for Sanctions.

On February 23, 2007, a Consent Order was entered in which the claims raised in the Second Amended Complaint were dismissed with prejudice, reserving jurisdiction over the claims for sanctions and indemnification ("Contested Matters"). (Consent Order entered February 23, 2007.)

*Factual Background for TBL*

Parsch and Patterson had known each other since 1998 and were "very good" friends who "continued a business relationship until the [very late] fall of 2003." (Transcript of hearing November 17-18, 2008, at 981–82, 1018 (Patterson) (hereinafter "Tr.").)

At the time of the TBL transaction (October 31, 2002), Triad, managed and controlled by Massey, was a 16.10% shareholder of Tovaris. (Countercl. at 2; Tr. at 302 (Massey).) Gorman served as in-house legal counsel for Triad. (Tr. at 31 (Gorman).)

As of June 20, 2002, Gordon, Patterson, Gerard, Tunner, and Joynes were elected members of the Tovaris Board of Directors ("Reconstituted Board"). (Tr. at 68–70 (Gorman).)

Prior to the election of the Reconstituted Board, Gordon had served as the President and Chief Executive Officer ("CEO") of Tovaris until Gerard replaced him in April 2002. Patterson had served on the original Board of Directors of Tovaris ("Original Board"). (Countercl. at 2, 4; Tr. at 69 (Gormon), 263–65 (Gerard).) Gerard later joined GlobalCerts as its President and CEO. (Tr. at 287 (Gerard).)

Tunner was the Chief Financial Officer ("CFO") of Triad when Massey asked Tunner to join the Reconstituted Board; Tunner remained an employee of Triad for the duration of his time as a Tovaris director. (Tr. at 153–58 (Tunner), 320 (Massey).)

Joynes had previously provided legal services for Triad when Massey asked Joynes to join the Reconstituted Board; Joynes also had a personal relationship with Massey through mutual community activities. (Tr. at 233–37 (Joynes), 320 (Massey).)

Triad was the sole member of and source of funding for Tovaris I.P. (Tr. at 98 (Gorman).) Tovaris I.P. legally changed its name to GlobalCerts. (Countercl. at 2.) Triad invested over $2,000,000 in GlobalCerts. (Tr. at 103 (Gorman).)

The Investor Rights Agreement ("IRA") required, *inter alia*, Tovaris to grant investors holding at least 20,000 shares of Series A Preferred Stock ("Series A Stock") a right of first refusal to purchase a pro rata share of any new securities and a thirty-day written notice of any proposal to issue new securities. (Counterclaim Defendants' Exhibit No. 3 (hereinafter "Countercl. Defs.' Ex.").)

In September 2001, Parsch offered to make a $3.5 million equity financing ("Series B financing") in order to provide Tovaris additional funding. (Tr. at 606 (Walters).)

Dominion Partners, L.P. ("Dominion Partners") conducted a financial evaluation of Tovaris on October 8, 2001. (Countercl. Defs.' Ex. 1.) The evaluation placed the value of Tovaris between $10,300,000 and $24,000,000, forecasting that Tovaris would attain a $900 positive cash flow in 2002, notwithstanding, Tovaris never had been, nor would ever become, cash flow positive. (Tr. at 548–49, 560, 562–63 (Walters); Countercl. Defs.' Ex. 1.)

On October 31, 2001, Tovaris management signed a Convertible Promissory Note (hereinafter, "Triad Bridge Loan Note" or "TBL Note") and Share Exchange Agreement with Triad, wherein Triad agreed to lend Tovaris $1,000,000, due by July 1, 2002, provided that Tovaris authorized Triad to exchange its Series A Stock for a new class of stock, called the Series A-1 Preferred Stock (the "New Stock"), which had a liquidation preference over all other classes of stock. (Counterclaim Plaintiff's Exhibit No. 14, 17 (hereinafter "Countercl. Pls.' Ex.").) Shareholder approval of the proposed issuance of the New Stock was required because their rights were affected by its issuance. (Tr. at 49 (Gorman).)

The default provisions of the TBL Note included the following: (i) Section 5.2 warranted that all persons required to approve the TBL had granted their approval; (ii) Section 6.1(h) gave Triad the right to declare default upon reasonable belief that the prospect of payment or performance was impaired or that a material adverse change had occurred; (iii) Section 6.1(o) gave Triad the right to declare default if it determined in its sole discretion that Tovaris's prospects for additional debt or equity financing or

continued operations were impaired; and (iv) Section 6.1(q) gave Triad the right to declare default if, after discussions conducted in good faith, Triad determined that Tovaris would not become cash-flow positive by July 1, 2002. (Countercl. Pls.' Ex. 14.)

Gordon sent a letter to the shareholders, dated December 11, 2001, in which he requested that, in order to finalize the TBL, the shareholders approve an amendment to Tovaris's Certificate of Incorporation and creation of the class of New Stock, sign waivers, and forfeit their notice and participation rights under the IRA. (Countercl. Defs.' Ex. 11.)

Gordon sent a letter to Parsch, dated December 13, 2001, in which Gordon acknowledged Parsch's Series B financing offer, stating that he "discussed this matter with Triad" and Triad "indicated that they would be willing to speak with any prospective investors at the investor's convenience." (Countercl. Defs.' Ex. 12.)

Tovaris management obtained majority shareholder approval and documentation requested in Gordon's December 11, 2001, letter by February 5, 2002. (Countercl. 5–6.)

Triad issued a notice of default on February 12, 2002. (Am. Compl. at 8–10; Tr. at 313–14 (Massey).)

Parsch sent a letter to Gordon, dated February 13, 2002, in which Parsch alleged several improprieties regarding the TBL, including violation of shareholders' rights under the IRA. (Countercl. Defs.' Ex. 15.) Specifically, Parsch alleged that the TBL was preferentially biased toward Triad and thus unenforceable, that the shareholders were not provided copies of the TBL, that Tovaris failed to give the Series A shareholders notice and to obtain their consents until after the TBL was ratified; that Gordon intentionally withheld TBL documents requested by Parsch, and that Tovaris rejected Parsch's Series B financing that would have "eliminated the need for any side deal" with Triad. (*Id.*)

Michael Dykstra prepared a report on February 18, 2002, at the request of Massey, to "[o]bjectively look at [Tovaris's] current status and reach high-level conclusions regarding strategic alternatives." (Countercl. Defs.' Ex. 16.)

In a letter dated March 20, 2002, Massey, appearing to speak for Tovaris management, personally responded to Parsch's allegations set forth in the February 13, 2002, letter to Gordon. (Countercl. Defs.' Ex. 17.) Massey stated that the shareholders had been afforded their right to participate in the TBL. (*Id.*) Massey also stated that the "Series B financing had become a pipe dream" on account of the fact that Tovaris lacked "revenues, a significant

sales, and a cash flow positive, or survivable, corporate scenario." (*Id.*) Massey concluded that the Series B financing "was not worth [Tovaris] management's serious consideration." (*Id.*)

Parsch responded to Massey in a letter dated March 22, 2002, in which Parsch reiterated his allegations made in the February 13, 2002, letter to Gordon regarding perceived improprieties in the TBL transaction and breach of the IRA. (Countercl. Defs.' Ex. 18.) Additionally, Parsch alleged that the parties knew that the terms and conditions of the TBL were impossible to satisfy and constituted a fraudulent transfer, that the TBL terms were decided without Patterson's knowledge, and that Gordon agreed to the TBL in part because he was concerned about his personal financial welfare. (*Id.*)

In the summer of 2002, Walters and Parsch collaborated with Patterson and his counsel, W. McIlwaine Thompson, Jr., to facilitate additional financing for Tovaris by Parsch in the amount of $5,000,000. (Tr. at 636–44, 648–52, 892–93 (Walters); Countercl. Defs.' Exs. 20, 22, 23.) Walters testified that this financing offer was designed to allow Tovaris to pay the TBL and avoid foreclosure of its assets. (*Id.*)

On June 20, 2002, a special meeting was held at Massey's office in Richmond to allow the directors of the Reconstituted Board to accept their appointments and election and to discuss the pending motion for default judgment against Tovaris by Triad. (Countercl. Pls.' Ex. 30.) In addition to the directors on the Reconstituted Board, both Massey and Gorman were present at the board meeting. (*Id.*)

In his capacity of managing owner of Triad, Massey sent Tovaris a letter on October 23, 2002, setting forth the terms upon which Triad's position under the TBL could be purchased. Massey stated that it had "come to his attention that there may be interest in buying Triad's position in Tovaris." (Countercl. Defs.' Ex. 26.) Massey requested that any potential investor buy Triad's stock, at its full face value, for $650,000 in addition to paying off the TBL note. (*Id.*) Massey then stated that its offer would expire in two weeks time and that, if the deadline were not met, "a judgment sale of Tovaris's assets will be held." (*Id.*)

In his capacity as director of Tovaris, Patterson sent Tovaris shareholders a letter dated December 18, 2002, stating that Tovaris management had been operating in an improper manner without his knowledge, that "egregious breach[es]" had occurred that "carrie[d] legal consequences," that his name had been forged on corporate documents, and that the Reconstituted Board did not appropriately consider alternative investments to the TBL, including equity investments proposed by Parsch. (Countercl. Defs.' Ex. 29.)

On December 20, 2002, Tovaris was sold in an Article 9 foreclosure sale to Triad for approximately $2,300,000. (Countercl. at 9.) As a result, shareholders lost their entire equity stake in Tovaris, and Triad took possession of all of the assets of Tovaris. (*Id.*) Three days after the foreclosure sale, Triad transferred Tovaris's assets to Tovaris I.P., a shell company. (Am. Compl. at 6; Countercl. at 9; Tr. at 87 (Gorman); Countercl. Defs.' Ex. 39.) Tovaris I.P. changed its name to GlobalCerts in November 2003. (Countercl. at 2.)

In an e-mail from Patterson to Parsch, dated January 30, 2003, Patterson stated that the company had not given the holders of Series A Stock thirty-day notice of the TBL transaction or informed them of their participation rights as required under the IRA. (Countercl. Defs.' Ex. 34.) Patterson also stated that Massey and Triad "held life or death" over the company's head. (*Id.*)

Patterson and Parsch, in a joint effort, called and drafted a notice for a special meeting of the Tovaris shareholders on January 31, 2003, to "discuss and take action" on matters relating to the TBL. (Tr. at 1014–15, 1019, 1079 (Patterson).) Patterson attended the meeting and was outspoken in his support of possible litigation against the Counterclaim Plaintiffs. (Tr. at 690–92 (Paskoff); Deposition of Kurtis Ford Parsch, September 25, 2008, at 385, 390 (hereinafter "Dep. Tr.").)

*Case Development by Walters and Counterclaim Defendants*

Walters testified that, prior to filing the Original Complaint, he reviewed, *inter alia*, the following:

a. The Dominion Partners's financial evaluation of Tovaris, dated October 8, 2001 (Tr. at 546–49, 560, 562–63 (Walters); Countercl. Defs.' Ex. 1);

b. The TBL Note, dated October 31, 2001 (Tr. at 570–72 (Walters); Countercl. Defs.' Ex. 2);

c. The IRA (Tr. at 572–74 (Walters); Countercl. Defs.' Ex. 3);

d. Gordon's letter to the shareholders of Tovaris, dated December 11, 2001 (Tr. at 579 (Walters); Countercl. Defs.' Ex. 11);

e. Gordon's letter to Parsch, dated December 13, 2001 (Tr. at 606–07, 690 (Walters); Countercl. Defs.' Ex. 12);

f. Parsch's letter to Gordon, dated February 13, 2001 (Tr. at 575, 578–79 (Walters); Countercl. Defs.' Ex. 15);

g. Dystra's report for Massey, dated February 18, 2002 (Tr. at 598–99 (Walters); Countercl. Defs.' Ex. 16);

h. Massey's letter to Parsch, dated March 20, 2002 (Tr. at 493, 617–18 (Walters); Countercl. Defs.' Ex. 17);

i. Parsch's letter to Massey, dated March 22, 2002 (Tr. at 621–24 (Walters); Countercl. Defs.' Ex. 18);

j. Triad's letter to Tovaris, dated October 23, 2002 (Tr. at 653–54 (Walters); Countercl. Defs.' Ex. 26);

k. Patterson's letter to Tovaris shareholders, dated December 18, 2002 (Tr. at 655–62 (Walters); Countercl. Defs.' Ex. 29); and

l. Patterson's e-mail to Parsch, dated January 30, 2003 (Tr. at 435–37, 667–68 (Walters); Countercl. Defs.' Ex. 34).

Walters testified that, prior to filing the Original Complaint, he asked Parsch, Paskoff, and Patterson, as shareholders who were entitled to notice and a right of first refusal under the IRA, whether Tovaris had given them such notice of its intent to issue New Stock to Triad or a chance to participate in that issuance. (Tr. at 557–58, 575–78, 593 (Walters).) Walters testified that Parsch, Paskoff, and Patterson all stated that they had not been given notice or a right of first refusal prior to the execution of the TBL and that his review of documents surrounding the TBL transaction confirmed their statements. (*Id.*)

Walters testified that prior to filing the Original Complaint, Parsch, Patterson, and Paskoff indicated that Massey exercised control of Tovaris. (Tr. at 386–87, 392, 435–36) (Walters).) Walters testified that Parsch and Friedman indicated that Triad was a majority shareholder. (Tr. at 460 (Walters).)

Walters testified that, prior to the Original Complaint, he reviewed an e-mail from Patterson to Parsch, dated February 7, 2001, containing an e-mail from Massey to Gordon, in which Patterson stated that Massey helped Gordon deal with problems created for Tovaris due to errors made by the law firm of LeClair Ryan, P.C., and that Massey also helped draft a letter to the investors of Tovaris. (Tr. at 398–407, 508 (Walters); Countercl. Defs.' Ex. 10.)

On September 18, 2003, Patterson sent Walters an e-mail regarding Patterson's recent conversation with Parsch regarding Tovaris and, specifically, the status of litigation against Tovaris. (Countercl. Defs.' Ex. 38.) He stated that he was "most interested in joining the litigation against the management of Tovaris, and, if need be, Ivor Massey." (*Id.*) He also stated that he was willing to pay his share of the attorneys' fees and litigation. (*Id.*)

After Patterson's communication with Walters on September 18, 2003, but prior to the filing of the Original Complaint, Patterson talked to his friend Dean Rifkin about litigation against Tovaris. (Tr. at 1075–77 (Patterson).) Patterson testified that Rifkin opined that the case lacked merit and that Patterson should not pursue litigation. (*Id.*) Patterson testified that he informed Parsch that he intended to remove himself from the litigation as a plaintiff, but he acknowledged that he had not informed Walters or any of the other Counterclaim Defendants of his changed position. (Tr. at 1073–78, 1082–87 (Patterson).) Patterson also did not inform Walters or any of the Counterclaim Defendants that the factual issues he had raised about the TBL, the actions and omissions of the board of directors, and the control exercised by Triad and Massey were incorrect or otherwise not his accurate observations. (Tr. at 666–67 (Walters), 1012 (Patterson).)

Walters received a letter from Smallwood on December 17, 2003, in which Smallwood stated that he had "made several attempts to get [Massey] to consider a cash infusion from Kurt Parsch, but all attempts were stonewalled by [Massey]." (Tr. at 595–96 (Walters); Countercl. Defs.' Ex. 41.) Smallwood also stated that he was "pressured . . . to sign [the] [waiver and] agreement to borrow money from Ivor Massey." (Tr. at 594–96 (Walters); Countercl. Defs.' Ex. 41.) Walters testified that Paskoff similarly stated that she was pressured to sign the waivers. (Tr. at 594 (Walters).)

On December 8, 2004, Walters sent an e-mail to Parsch and Emerson Marks, Esquire ("Marks"), dated December 8, 2004, in which Walters stated that the Plaintiffs would not be able to add additional parties to the complaint after the statute of limitations deadline; thus, they needed "to ensure that every possible Defendant [was] listed as a Defendant when [they] file[d]" and "to err on the side of being overly inclusive." (Tr. at 783–85 (Walters); Countercl. Pls.' Ex. 58.)

On December 10, 2004, at 2:17 p.m., Walters sent an e-mail to Parsch and stated, "Kurt, all of my background documents are in Emerson's office, and he is on a conference call. Do you have lists of the board members of the old and new Tovaris that you could e-mail or fax to me?" (Countercl. Pls.' Ex. 58.) Parsch responded to Walters in e-mails sent at 2:56 p.m. and 3:17 p.m., providing twelve names. (*Id.*) The list contained errors, including naming Gorman as a director of the Reconstituted Board. (*Id.*) Walters relied on this list to determine the members of the Original Board and Reconstituted Board. (Tr. at 786–94 (Walters).)

Patterson gave Parsch the "original lists of the shareholders and board members . . . [and] the list of the reconstituted board." (Tr. at 1027 (Patterson); Dep. Tr. at 172–73 (Parsch).) Parsch stated that he had no other basis for naming Gorman as a director. (*Id.*)

456

Walters testified that, prior to filing the Amended Complaint, he relied upon oral representations made by Parsch and Steven Friedman in a meeting on December 15, 2004, during which Parsch and Friedman confirmed the accuracy of each allegation of the Amended Complaint, including the capacity in which each named Defendant was to be sued. (Tr. at 810–12, 814, 819–20 (Walters).)

In 1984, Parsch was convicted of making and executing paper plates in the likeness of plates designated for the printing of obligations of the United States, in violation of 18 U.S.C. § 474. (Countercl. Pls.' Exs. 98–99.) In 1990, Parsch pleaded guilty to two charges of grand larceny in violation of Va. Code §§ 13.1-502 and 13.1-520, also known as the "blue sky laws." (Countercl. Pls.' Ex. 97.)

In 2002, Walters represented Parsch in the case of *Richard S. Arkward v. Trustees of the KFP Trust et al.*, Law No. 01L132, in the Circuit Court of Fluvanna County. Walters testified that opposing counsel brought up information regarding Parsch's 18 U.S.C. § 474 conviction, but that Walters nonetheless obtained favorable results for Parsch. (Tr. at 625–28 (Walters).) Walters testified that he also represented Parsch in a case in the Circuit Court of Chesterfield County, during which information regarding Parsch's indictments under the Blue Sky Laws surfaced, but that Walters also obtained favorable results for Parsch. (*Id.*)

Prior to filing the Amended Complaint, Walters relied on the representations of Friedman when Friedman was no longer affiliated with Tovaris. (Tr. at 814 (Walters).) Friedman was formerly involved with Tovaris because his company, CoDevelop, had originally approached Triad about investing in Chainmail, the predecessor entity of Tovaris. (Tr. at 305–06 (Massey), 209–12 (Gordon).) Walters testified that Friedman had remained in contact with various Tovaris shareholders and employees. (Tr. at 814 (Walters).)

Prior to filing the Original Complaint and Amended Complaint, Walters failed to verify the capacities of each named Defendant with filings from the State Corporation Commission or Tovaris capitalization tables. (Tr. at 473–80 (Walters).)

*Actions Taken between the Filing of the Amended Complaint and the Filing of the Second Amended Complaint*

On October 21, 2005, Friedman sent an e-mail to Walters, in which Friedman stated that Gary McGraw was not a director or officer of Tovaris and thus should not have been named as a Defendant in the Amended

Complaint. (Countercl. Defs.' Ex. 44.) Walters thereafter nonsuited McGraw. (Tr. at 742–43 (Walters).)

On February 27, 2006, Walters sent Defendants' Counsel a letter, admitting the existence of errors in the Amended Complaint regarding the capacities of some of the named Defendants, stating that he "intend[ed] to correct such misstatements by moving the Court for leave to amend a second time." (Tr. at 745–46 (Walters); Countercl. Defs.' Ex. 45.)

Walters testified that he orally represented to Defendants' Counsel his intention to wait until the Court decided the pending demurrer and thereafter to file a single amended complaint to correct all errors relating to capacities and to address any issues raised by the Court in its decision on the demurrers. (Tr. at 745, 798 (Walters).)

## Conclusions of Law

### Claim for Sanctions Pursuant to Va. Code § 8.01-271.1

At issue is whether the Counterclaim Defendants violated Va. Code § 8.01-271.1. When an attorney or a party signs a pleading, he certifies that "to the best of his knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and it is not interposed for any improper purpose. . . ." Va. Code § 8.01-271.1. Should a court find that a pleading violates this standard, the court "shall impose upon [the attorney], a represented party, or both, an appropriate sanction. . . ." Id.

The ability of a court to impose sanctions serves a number of important policy considerations. The possibility of sanctions prevents litigants from filing frivolous or meritless lawsuits and prevents innocent defendants from having to bear the considerable financial and mental burdens associated with the defense of such claims. See Oxenham v. Johnson, 241 Va. 281, 286, 402 S.E.2d 1, 4 (1991). When determining whether sanctions are warranted in a given matter, however, a court should be careful not to "stifle counsel in advancing novel legal theories or asserting a client's rights in a doubtful case." Id. 241 Va. at 286, 402 S.E.2d at 4.

When assessing conduct allegedly in violation of Va. Code § 8.01-271.1, the Court should apply an objective standard of reasonableness. See County of Prince William v. Rau, 239 Va. 616, 620, 391 S.E.2d 290, 291 (1990) (citing Tullidge v. Board of Supervisors, 239 Va. 611, 613, 391 S.E.2d 288, 289 (1990).) Thus, to establish a basis for sanctions, the factual record

and existing law must be sufficient to establish that, after reasonable inquiry, the Counterclaim Defendants could not have formed a reasonable belief that their allegations were well grounded in fact and warranted by law. *Rau*, 239 Va. at 620, 391 S.E.2d at 291.

The Court should not award sanctions because contrary inferences may be drawn from the facts or because counsel or the represented party might not prevail on the merits of the cause. *See Becon Servs. Corp. v. Hazel Indus.*, 33 Va. Cir. 554, 559 (Loudoun County 1992). Any doubts are resolved in favor of the party so charged; the Court must eschew the wisdom of hindsight. *Rau* at 620, 391 S.E.2d at 291 (citing *Tullidge*, 239 Va. at 613, 391 S.E.2d at 290).

Parties have a duty to make a reasonable inquiry to avoid the unnecessary time and expense of baseless litigation. *See Oxenham*, 241 Va. at 286, 402 S.E.2d at 4. This duty arises each time a lawyer files a "pleading, motion, or other paper" or makes "an oral motion." *Id.*, 241 Va. at 288, 402 S.E.2d at 5. There is no continuing duty for a lawyer to update his pleadings in light of any new findings, but if he files "any paper or ma[kes] any motion in the case *after* he knew, or reasonably should have known, that he could not create a factual claim," then the court may award sanctions. *Id.*

In determining whether the duty of "reasonable inquiry" set forth in Va. Code § 8.01-271.1 has occurred, "it is not necessary that an investigation into the facts be carried to the point of absolute certainty. . . . [t]he investigation need merely be reasonable under the circumstances." *Kraemer v. Grant County*, 892 F.2d 686, 689 (7th Cir. 1990). Whether an appropriate amount of pre-filing investigation was done is a fact-bound inquiry that requires judicial discretion and inevitably is a judgment call. *See Ford Motor Co. v. Benitez*, 273 Va. 242, 250, 639 S.E.2d 203, 206 (2007); *see also Mars Steel Corp. v. Continental Bank*, 880 F.2d 928, 933 (7th Cir. 1989).

"The duty of inquiry should be regarded as nondelegable but capable of being satisfied by [counsel's] acquisition of the product of inquiry conducted by others." *Frantz's Auto. Servs., Inc. v. Crabtree*, 21 Va. Cir. 443, 445 (Fairfax County 1990). "Thus if the client furnishes facts to the attorney which [the attorney] can reasonably believe, there should be no need for further inquiry to satisfy" the duty of reasonable inquiry. *Id.* However, "[b]lind reliance on the client is seldom a sufficient inquiry," since blind reliance is rarely reasonable under the circumstances. *In re Kunstler*, 914 F.2d 505, 514 (4th Cir. 1990) (quoting *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986)).

A court must separately analyze for sanctions purposes each individual cause of action that was alleged in the pleadings. *See Gilmore v. Finn*, 259 Va. 448, 466, 527 S.E.2d 426, 436 (2000); *see also Nedrich v. Jones*, 245 Va.

465, 471–72, 429 S.E.2d 201, 204 (1993). Thus, for each allegation, this Court must determine whether a reasonable inquiry existed, after which Counterclaim Defendants could have formed a reasonable belief that the cause of action was well grounded in fact and warranted by law. The Amended Complaint contained eight separate counts against the Counterclaim Plaintiffs and shall be grouped and addressed accordingly: the Breach of Fiduciary Duty Claims (Counts I and VI); the Fraud Claims (Counts II, III, and V); the Claim of Breach of Investor Rights Agreement (Count VII); and the Accounting Claim (Count IV).

## I. *Breach of Fiduciary Duty Claims*

It is a well-established tenet of corporate law that directors and officers of a corporation owe fiduciary duties of loyalty and care in their dealings with the corporation and with the corporation's shareholders. *See Glass v. Glass*, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984) (citing *Adelman v. Conotti Corp.*, 215 Va. 782, 790, 213 S.E.2d 774, 779 (1975)); Va. Code § 13.1-673; *Rowland v. Kable*, 174 Va. 343, 366, 6 S.E.2d 633, 642 (1940).

Dominant or controlling shareholders also owe minority shareholders fiduciary duties. *See Brown v. Scott County Tobacco Warehouses*, 5 Va. Cir. 75, 79 (Scott County 1983). "It is the fact of control held and exercised of the common property, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation." *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 492 (1919). Dominant or controlling shareholders must exercise good faith and care to protect the interests of minority shareholders and to secure and deliver to them their just proportion of the income out of the proceeds of the property. *Brown v. Scott*, 5 Va. Cir. at 81. Any disposition of the corporation or its assets to deprive the minority holders of their just share of it or to gain for themselves at the expense of the holders of the minority of the stock is a breach of their duties and of trust. *Id.*

## A. *Reasonable Inquiry*

Counterclaim Plaintiffs allege that the Counterclaim Defendants failed to conduct a reasonable inquiry with respect to the proper capacities of the named Defendants in the Original and Amended Complaints. (Findings of Fact at ¶ 13.) The Court must decide whether, and under what circumstances, the duty of reasonable inquiry required the Counterclaim Defendants to further investigate: (1) the sources of information about shareholders and board members of the Original and Reconstituted Boards of Tovaris used by the

Counterclaim Defendants to determine the capacities of the named Defendants; and (2) the factual assertions made by Patterson and others during the events leading up to the litigation, which the Counterclaim Defendants relied upon.

The Court finds that, under the circumstances, it was reasonable for the Counterclaim Defendants to rely on the list of shareholders and directors provided to Walters by Parsch. (Findings of Fact at ¶ 54.) Although it contained errors, Parsch received the list from Patterson. (Findings of Fact at ¶¶ 54–55.) As a director of both the Original and Reconstituted Boards, Patterson was in a position to know the identities of the directors of both Boards, and his credibility had never been questioned. (Findings of Fact at ¶¶ 21–22.) Walters also received confirmation that the Defendants were named in their proper capacities from Friedman, another source who reasonably appeared to be in a position to know the identities of the Tovaris directors, even though his knowledge was premised upon more dated involvement with Tovaris. (Findings of Fact at ¶¶ 56, 59.)

Furthermore, the Court finds that, under the circumstances, it was reasonable for Walters to rely on the facts provided by Parsch concerning the capacities of the named Defendants. (Findings of Fact at ¶ 56.) Parsch was a Tovaris shareholder who actively sought information about events surrounding the TBL transaction (Findings of Fact at ¶¶ 35, 37–38); Parsch had a close personal and professional relationship with Patterson, a Tovaris director (Findings of Fact at ¶ 19); and despite Parsch's criminal history, Walters had successfully represented Parsch in prior litigation (Findings of Fact at ¶ 58). These circumstances gave Walters a reasonable basis to believe that Parsch was credible at the time and was in a position to furnish information about Tovaris, including the identities of its shareholders and directors. Thus, further investigation of those facts provided by Parsch was not required to satisfy the duty of reasonable inquiry.

The Court finds that it was reasonable for the Counterclaim Defendants not to conduct further inquiry after Patterson decided not to join as a plaintiff in the litigation (September 2003) and before the Original and Amended Complaints were filed (December 2004). This conclusion is premised upon Patterson's consistent and active participation in the development of litigation against Tovaris and the Counterclaim Defendants' (with the exception of Parsch) lack of knowledge of Patterson's changed position. Patterson's role as an original advocate for litigation is significant in the following respects:

a. Patterson had been highly active and publicly involved in the events leading up to the litigation against Tovaris; Patterson and his counsel, Thompson, worked jointly with Parsch's counsel to facilitate Parsch's

financing offer to Tovaris (Findings of Fact at ¶ 39); Patterson wrote a letter to Tovaris shareholders in his capacity as a director in December 2002, alleging improper conduct, including a failure to consider alternative investments, by the Tovaris management (Findings of Fact at ¶ 42); Patterson called a special meeting of the shareholders to discuss litigation against Tovaris in January 2003 (Findings of Fact at ¶ 45); and Patterson wrote an e-mail to Walters stating that he was "most interested in joining the litigation" against Tovaris and Massey in September 2003 (Findings of Fact at ¶ 50).

b. Patterson failed to inform Walters (or any other shareholder plaintiff, with the exception of Parsch) that he no longer wished to participate in the litigation or that any of his prior assertions were false or inaccurate. (Findings of Fact at ¶ 51.)

The Court finds that, under the circumstances, the Counterclaim Defendants had a reasonable basis to believe that Patterson's factual assertions were well grounded, even after Patterson told Parsch that he no longer wanted to join in the litigation against Tovaris. (Findings of Fact at ¶ 51.) The fact that Patterson changed his mind about being a plaintiff in the case does not mean that his prior factual assertions were suddenly false or groundless. Thus, the Court finds that the Counterclaim Defendants satisfied the duty of reasonable inquiry set forth in Va. Code § 8.01-271.1.

B. *Reasonable Basis*

With respect to the Defendants who were properly named in the Original and Amended Complaints, the Court finds that the Counterclaim Defendants possessed a reasonable basis to allege that the Counterclaim Plaintiffs breached their fiduciary duties of care and loyalty to the shareholders before, during, and after the execution of the TBL by engaging in a loan that favored one shareholder to the detriment of all other shareholders.

The TBL terms required Tovaris to pay off the $1,000,000 loan in its entirety within eight months and allowed Triad to unilaterally declare Tovaris to be in default. (Findings of Fact at ¶¶ 29–30.) However, prior to executing the TBL, an independent financial evaluation of Tovaris had determined that Tovaris could not attain significant and sustained positive cash flow by the TBL repayment deadline. (Findings of Fact at ¶ 28.) Furthermore, Patterson and other shareholders had opined that Tovaris management failed to properly consider alternative investments in Tovaris. (Findings of Fact at ¶ 42.)

The combination of the TBL terms, the financial evaluation, and the alleged lack of consideration of financing alternatives gave Counterclaim Defendants a reasonable basis to allege that the directors of the Original and

Reconstituted Boards were not acting in the shareholders' best interests when they initially approved and later allowed the TBL transaction to be finalized. Although the lending climate at the time may have been risky, warranting stringent creditor protection, the loan documents could have been reasonably interpreted as unfair, even facially confiscatory. The focus is on whether Counterclaim Defendants could have formed a reasonable belief that their allegations were well grounded in fact and warranted by law. Absent a trial on the merits, it is impossible to gauge which side could have prevailed on these issues. The Court finds that, based on the facts as presented, the Counterclaim Defendants could have formed such a reasonable belief.

With respect to the Defendants who were incorrectly named in the Original and Amended Complaints, the Court finds that the Counterclaim Defendants possessed a reasonable basis to allege that Massey and Gorman breached their fiduciary duties by engaging in a loan that favored one shareholder to the detriment of all other shareholders.

Although Massey's involvement in the TBL transaction was inherent in his role as the manager of Triad, his involvement reasonably appeared to be more than that of a minority shareholder. Massey had directed Gordon on how to handle problems, problems that a controlling shareholder or director would reasonably have handled, for Tovaris in the past. (Findings of Fact at ¶ 49.) Furthermore, Massey responded to a letter that Parsch wrote to Tovaris management regarding allegations about improprieties by Tovaris management. (Findings of Fact at ¶ 37.) Gordon also indicated to Parsch that, when considering financing offers to Tovaris, Tovaris first had to discuss the matter with Massey and Triad; however, Smallwood claimed that Massey "stonewalled" any attempts to consider Parsch's financing offer. (Findings of Fact at ¶¶ 32, 52.) Considering these sources together, in addition to various claims that Massey exercised control over Tovaris (Findings of Fact at ¶ 48), Counterclaim Defendants had a reasonable basis for alleging that Massey controlled Tovaris, either directly or through Triad, and failed to exercise good faith and care to protect the interests of the minority. Indeed, Counterclaim Plaintiffs' own evidence established that Massey was indeed, *de facto*, the controlling shareholder of Tovaris.

Gorman had a close professional relationship with Massey; he attended a Board meeting at which only Tovaris directors and Massey were in attendance, and Patterson, who was in a unique position to have direct knowledge and whose credibility had never been questioned, claimed that Gorman was a Tovaris director. (Findings of Fact at ¶¶ 20, 40, 54–55.) These circumstances gave Counterclaim Defendants a reasonable basis to allege that

Gorman, in his capacity as a director, breached fiduciary duties to Tovaris shareholders by engaging in a loan that favored Triad to the detriment of all other Tovaris shareholders.

The Court finds that the Counterclaim Defendants, after conducting a reasonable inquiry, could have formed a reasonable belief that their allegations of breach of fiduciary duty were well grounded in fact and warranted by law, as required by Va. Code § 8.01-271.1. Sanctions, therefore, are not awarded against Counterclaim Defendants with respect to Counts I and VI of the Amended Complaint.

## C. *Maintenance of Litigation*

After Counterclaim Plaintiffs filed their Counterclaim to the Amended Complaint, Counterclaim Defendants admitted to opposing counsel that they were mistaken about capacities of Massey and Gorman. (Findings of Fact at ¶ 62.) Although the Counterclaim Defendants did not dismiss the litigation entirely, they did not file any papers or otherwise pursue allegations based on those erroneous capacities. Instead, through written and oral statements, they admitted to the errors and assured counsel that the errors would be corrected. (Findings of Fact at ¶¶ 62–63.) Thus, the Court does not award sanctions against Counterclaim Defendants for maintenance of litigation premised on knowingly incorrect information.

## II. *Breach of Investor Rights Agreement*

The Court finds that the Counterclaim Defendants had a reasonable basis to allege that the Counterclaim Plaintiffs breached the IRA. The TBL Note and Share Exchange Agreement required that Tovaris issue the New Stock to Triad. (Findings of Fact at ¶ 29.) Thus, under terms of the IRA, Tovaris was required to give holders of Series A Stock a thirty-day notice of the proposed issuance of the New Stock. (Findings of Fact at ¶ 26.) However, Parsch and Paskoff told Walters that they personally, as holders of Series A Stock, did not receive this required notice. (Findings of Fact at ¶ 47.) Parsch and Paskoff's claims were confirmed by Patterson's statements that Tovaris management failed to give shareholders proper notice and participation rights. (Findings of Fact at ¶ 44.) Finally, Walters testified that his review of all documents related to the TBL litigation did not reveal evidence that the shareholders received such notice. (Findings of Fact at ¶ 47.)

Although Counterclaim Plaintiffs deny that any violation of the IRA existed, the case before this Court is one of sanctions, not merits of the cause. The Court finds that, after a reasonable inquiry, Counterclaim Defendants

could have formed a reasonable belief that their allegation that Counterclaim Plaintiffs breached the IRA was well grounded in fact and warranted by principles of contract and corporate law. Sanctions, therefore, are not awarded against the Counterclaim Defendants with respect to the allegations made in Count VII of the Amended Complaint.

## III. *Fraud Claims*

When making allegations of fraud, the plaintiff is subject to a heightened standard of pleading in that "all averments of fraud . . . [and] the circumstances constituting fraud . . . shall be stated with particularity." *Parsch v. Massey*, 72 Va. Cir. 121, 129 (City of Charlottesville 2008) (quoting Del. Ch. Ct. R. 9(b).) This Court has already determined at the demurrer stage that, assuming all of the Counterclaim Defendants' alleged facts were true, a claim for fraud was pleaded inadequately under the heightened pleading standard. *See id.* However, the issue before the Court now is whether Walters and the Counterclaim Defendants could have formed a reasonable belief that their allegations in Counts II, III, and V of the Amended Complaint were well grounded in fact and warranted by law, irrespective of any deficiency in terms of specificity.

The Court finds that the following facts and circumstances taken together gave Counterclaim Defendants a reasonable basis to allege that the TBL transaction was designed to transfer for less than full and fair consideration the assets of Tovaris to entities owned or controlled by Counterclaim Plaintiffs and constituted a conversion of assets of Tovaris (Counts II and III):

a. The TBL Note required Tovaris to repay $1,000,000 in loan proceeds and be cash flow positive within eight months. (Findings of Fact at ¶¶ 29–30.) However, at the time the Original Board approved the TBL Note, Tovaris had never been cash flow positive and a credible financial evaluation estimated that Tovaris was only capable of obtaining a $900 positive cash flow result by 2002. (Findings of Fact at ¶ 28.) In addition to approving the TBL Note under such financial conditions, the Original Board approved default terms that allowed Triad to use its sole discretion in declaring Tovaris to be in default, after which Triad would take possession of the assets of Tovaris and other Tovaris shareholders would lose their investment. (Findings of Fact at ¶ 30.) One financial evaluation valued Tovaris at over $10,300,000. (Findings of Fact at ¶ 28.)

b. Furthermore, Patterson stated that the Reconstituted Board failed to consider financing alternatives, including a financing offer by Parsch, to repay the loan. (Findings of Fact at ¶ 42.) c. Ultimately, Tovaris did not survive what

all parties knew to be unfavorable financial conditions and stringent default terms; there is no question that Tovaris did not have sufficient cash to repay the TBL, and Triad declared Tovaris to be in default four and a half months earlier than the repayment deadline, ultimately taking possession of Tovaris's assets. (Findings of Fact at ¶¶ 34, 43.)

The Court finds that the following facts and circumstances taken together gave the Counterclaim Defendants a reasonable basis to allege that the Counterclaim Plaintiffs' omissions with respect to shareholder notice amounted to a fraudulent scheme to misrepresent material facts and to prevent shareholders from challenging the issuance of New Stock, all resulting in a fraudulent transfer of all the assets of Tovaris to Triad (Count V):

a. The TBL Note required that Tovaris issue the New Stock to Triad, which gave Triad liquidation preference over any other stock. (Findings of Fact at ¶ 29.) Tovaris was required to give shareholders notice, and to get shareholder approval, of the proposed issuance of the New Stock. (Findings of Fact at ¶¶ 26, 29.) However, Counterclaim Defendants had a reasonable basis to allege that Tovaris failed to give shareholders the required notice. (*See supra* Breach of Investor Rights Agreement.)

b. Furthermore, Tovaris management asked Tovaris shareholders to waive their notice and participation rights. (Findings of Fact at ¶ 31.) Paskoff and Smallwood stated that they were pressured to sign the waivers, and Walters testified, without contradiction, that Tovaris did not inform at least some shareholders of the alleged failure to give required notice. (Tr. at 588–89 (Walters); Findings of Fact at ¶ 47.)

c. On February 5, 2002, several weeks after the closing of the TBL, Tovaris finished receiving the required shareholder approval and waivers; and on February 12, 2002, more than four months earlier than the repayment deadline, Triad declared Tovaris to be in default of the TBL. (Findings of Fact at ¶¶ 33–34.)

The Court also finds that the Counterclaim Defendants had a reasonable basis to allege that Massey made misstatements to Counterclaim Defendants to prevent them from seeking alternative financing. (Findings of Fact at ¶ 8.) In a letter to Parsch, Massey denied that any shareholder rights had been violated, but Walters's sources had told him they were not given such rights. (Findings of Fact at ¶ 37.) Also, Smallwood claimed that Massey "stonewalled" any efforts to consider Parsch's financing offer that would allow Tovaris to repay the loan. (Findings of Fact at ¶ 52.)

Most of the remaining Counterclaim Plaintiffs had preexisting personal or professional relationships with Massey directly, or indirectly through Triad, at the time they became involved in the TBL transaction: Gorman was legal

counsel for Triad, Tunner was the CFO of Triad, and Joynes knew Massey personally and had provided legal services for Triad. (Findings of Fact at ¶¶ 20, 22–24.) Also, Gerard ultimately became the President and CEO of GlobalCerts, of which Triad was the sole member and source of funding. (Findings of Fact at ¶¶ 22, 25.) Tunner, Joynes, and Gerard constituted a majority of the Reconstituted Board, and they were all appointed between the time Triad declared the loan to be in default and the time the default was finalized by judgment. (Findings of Fact at ¶ 21.) Given the timing of their appointments and the existence of personal and professional relationships with Massey and Triad, Counterclaim Defendants had a reasonable basis to conclude that these Counterclaim Plaintiffs were motivated by their self-interest not to challenge the default judgment and to allow Tovaris's assets to be transferred to Triad, and essentially, to Massey himself. (Tr. at 509 (Walters).)

Since the case never went to trial, there was no full evidentiary hearing on the merits. (Findings of Fact at ¶ 18.) Based on the limited factual record, the Court could not determine conclusively whether the entire transaction was fraudulent or a proper exercise of discretion by the board of directors under the business judgment rule. But from the review of the facts and circumstances presented, it cannot be said that the Counterclaim Defendants lacked an objectively reasonable basis for their allegations of fraud. The Court also finds that the Counterclaim Plaintiffs conducted a reasonable inquiry, after which they could have reasonably believed that their allegations of fraud were well grounded in fact and warranted by law. Sanctions, therefore, are not awarded against the Counterclaim Defendants with respect to Counts II, III, and V.

## IV. *Claim for Accounting*

Virginia law provides a number of protections to shareholders in the form of various appraisal and accounting rights to ensure that an abusive or unscrupulous board of directors does not compromise the shareholders' interests. *See* Va. Code § 13.1-730.

In Count IV, Counterclaim Defendants requested an accounting of the foreclosure sale that took place in December 2002 as a result of Triad declaring Tovaris to be in default of the Triad Bridge Loan. (Findings of Fact at ¶ 7.) Counterclaim Defendants claimed that Triad realized far more value from the acquisition of Tovaris's assets than was due to Triad under the TBL and therefore wished to obtain a full accounting of the transaction. The Court must determine whether the Counterclaim Defendants could have reasonably believed that Count IV was well grounded in fact and warranted by existing law.

Triad obtained, by foreclosure sale, all of Tovaris's assets for approximately $2,300,000, but a financial evaluation had valued Tovaris over $10,300,000. (Findings of Fact at ¶¶ 28, 43.) Counterclaim Plaintiffs argued that the Counterclaim Defendants' accounting claim was unreasonable, because a Richmond Circuit Court had already conducted an accounting of the transaction at Triad's bequest. (Counterclaim Plaintiff Reply Brief at 39.)

However, the Counterclaim Defendants were not parties to the action in the Richmond Circuit Court, and the mere existence of the Richmond Circuit Court judgment, *ipso facto*, does not prevent the Counterclaim Defendants from challenging it. (Tr. at 868–69 (Walters).) Moreover, the possibility that the Counterclaim Plaintiffs might raise a collateral estoppel or res judicata defense is insufficient evidence for the Court to find that the Counterclaim Defendants lacked a reasonable basis for bringing an accounting claim. The Counterclaim Defendants could have reasonably concluded that the prior accounting, having resulted from an essentially uncontested prior suit, lacked validity. Thus, the Court finds that the Counterclaim Defendants could have formed a reasonable belief that the accounting claim was well grounded in fact and warranted in law despite a possible defense of collateral estoppel. Sanctions, therefore, are not awarded against the Counterclaim Defendants with respect to the allegations made in Count IV of the Amended Complaint.

*Claim for Indemnification Pursuant to Va. Code § 13.1-672.5*

Virginia Code § 13.1-672.5 outlines a separate standard for reimbursement at the termination of a derivative proceeding. This statute states that at the conclusion of a derivative proceeding, the court shall "[o]rder the plaintiff or the plaintiff's attorney to pay any defendant's reasonable expenses . . . incurred in defending the proceeding if it finds that the proceeding was commenced or maintained arbitrarily, vexatiously, or not in good faith." Va. Code § 13.1-672.5(2).

Although derivative lawsuits play an important role in protecting shareholders and curbing possible abuses of corporate discretion, corporations must also have sufficient protections from disingenuous suits brought by overzealous shareholders. Virginia Code § 13.1-672.5 fulfills this role by providing the corporation with an opportunity to seek reimbursement for such suits.

Counterclaim Plaintiffs point to court interpretations from other states of the terms used in the indemnification statute. (Counterclaim Plaintiff Post-Hearing Findings of Fact and Conclusions of Law at ¶¶ 284–89.) A suit has been found to be "vexatious" if it lacks justification, the sole purpose is to

cause annoyance, or it is intended to harass. *Sieg Co. v. Kelly*, 568 N.W.2d 794, 804 (Iowa 1997); *Thunberg v. Strause*, 682 A.2d 295, 299 (Pa. 1996). Counterclaim Plaintiffs also cite a Pennsylvania Supreme Court finding that counsel and plaintiffs acted "vexatiously" when they failed to remove parties having no connection with the incident after the error was repeatedly brought to their attention. *Bykowski v. Chesed Co.*, 625 A.2d 1256, 1259 (Pa. Super. Ct. 1993). A suit has been found to be "arbitrary" if there was no basis in law or fact for the action. *Thunberg v. Strause*, 682 A.2d at 300.

The Court concludes that, based on the evidence presented, Counterclaim Defendants did not vexatiously maintain the lawsuit. They promptly admitted to the errors made in the Amended Complaint with respect to the incorrectly named Defendants and corrected such errors in the Second Amended Complaint. (Findings of Fact at ¶¶ 62–63.) Furthermore, there is insufficient evidence that the Counterclaim Defendants brought this suit with the intent to harass or annoy. Finally, the Court has found that, with respect to each Count in the Amended Complaint, that the Counterclaim Defendants made a reasonable inquiry and had, to varying degrees, a reasonable basis in law and fact for each claim. It follows, therefore, none of the Counts were brought or maintained "arbitrarily, vexatiously, or not in good faith." Va. Code § 13.1-672.5. The Court does not grant the Counterclaim Plaintiffs an award of indemnification and reimbursement for the costs of defending a derivative proceeding pursuant to Va. Code § 13.1-672.5.

## Conclusion

For the foregoing reasons, the Court does not impose sanctions pursuant to Virginia Code § 8.01-271.1 against Counterclaim Defendants with respect to all Counts in the Amended Complaint, nor does the Court award indemnification pursuant to Virginia Code § 13.1-672.5. Consequently, all claims pending herein having been fully adjudicated, this case is herein stricken from the docket.